## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Kent-Stephen Kinlocke,

                Plaintiff,        Case No. 1:16-cv-04165

v.                           Michael L. Brown
                                 United States District Judge

Casey T. Benton and Officer J.E.
Fox,

                Defendants.

_____/

## ORDER

Defendant Officers Casey T. Benton and J.E. Fox seek summary judgment on Plaintiff Kent-Stephen Kinlocke's claims against them for excessive force and deliberate indifference under 42 U.S.C. § 1983. (Dkt. 47.) The Court grants Defendants' motion.

## I.    Factual Background

While on morning patrol in November 2014, Defendant Officer Benton observed an individual later identified as Plaintiff walking on the center median of Memorial Drive in Stone Mountain, Georgia. (Dkts. 47-2 ¶ 3; 54 ¶ 3.) Officer Benton made a U-turn to stop Plaintiff and conduct

an investigation. (Dkts. 47-2 ¶ 4; 54 ¶ 4; 55-1 ¶ 2.) Before Officer Benton could do so, Plaintiff crossed Memorial Drive at an area not marked by a crosswalk and kept walking on the sidewalk next to the street. (Dkts. 47-2 ¶ 5; 54 ¶ 5.)

Officer Benton turned on his blue lights, parked his patrol car near the sidewalk, exited the vehicle, and activated his personal body-worn camera.[1] (Dkts. 47-2 ¶ 6; 54 ¶ 6.) The body-cam footage captured the remaining interactions between Plaintiff and Defendant Benton. (Dkts. 47-2 ¶ 7; 54 ¶ 7.) While exiting his patrol car, Defendant Benton loudly called out to Plaintiff, repeatedly stating "Sir" and trying to get his attention. (Dkts. 47-2 ¶ 7; 54 ¶ 7.) Although he walked directly past the patrol car, Plaintiff did not acknowledge Defendant Benton and continued walking away. (Dkts. 47-2 ¶ 8; 54 ¶ 8.) Benton called out "sir" several more times to no avail. (Dkts. 47-2 ¶ 9; 54 ¶ 9.) He then walked quickly to catch up with Plaintiff, who continued walking down the

---

[1] Plaintiff responded "Agreed." to nearly all Defendants' facts, disagreeing with only a few but without pointing to any evidence to put the facts into dispute. The Court considers each of Defendants' facts admitted. LR 56.1(B)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent . . . directly refutes the movant's fact with concise responses supported by specific citations to evidence . . . .").

sidewalk away from him.  (Dkts. 47-2 ¶ 10; 54 ¶ 10.)  Once he caught up with Plaintiff, Officer Benton placed his hand on Plaintiff's right arm, and then his chest, and directed Plaintiff to stop walking away.  (Dkts. 47-2 ¶ 11; 54 ¶ 11.)  To prevent Plaintiff from leaving, Officer Benton positioned himself directly in front of Plaintiff in his direction of travel.  (Dkts. 47-2 ¶ 12; 54 ¶ 12.)

Plaintiff briefly stopped and asked Officer Benton, "What is your problem?"  (Dkts. 47-2 ¶ 13; 54 ¶ 13; 55-1 ¶ 3.)  Benton replied that he was stopping Plaintiff for walking down the center median and began to radio other units to notify them of his location, that there was a stop in progress, and to request assistance.  (Dkts. 47-2 ¶ 14; 54 ¶ 14; 55-1 ¶¶ 4, 12.)  Plaintiff, now visibly irritated, emptied his pockets, saying "I have nothing on me," and, after a brief pause, continued walking past Officer Benton.  (Dkts. 47-2 ¶ 15; 54 ¶ 15; 55-1 ¶¶ 7–8.)

Benton tried to stop Plaintiff again by placing his right hand on Plaintiff's chest and forcefully saying "Stop."  (Dkts. 47-2 ¶ 16; 54 ¶ 16; 55-1 ¶ 9.)  Plaintiff ignored the commands and kept going.  (Dkts. 47-2 ¶ 17; 54 ¶ 17; 55-1 ¶ 10.)  Officer Benton then reached for his taser and pointed it directly at Plaintiff.  (Dkts. 47-2 ¶ 18; 54 ¶ 18; 55-1 ¶ 10.)

Plaintiff again asked Officer Benton, "What is your problem?" (Dkts. 47-2 ¶ 19; 54 ¶ 19; 55-1 ¶ 13.) Officer Benton told Plaintiff to stop and sit down, but Plaintiff refused. (Dkts. 47-2 ¶¶ 20–21; 54 ¶¶ 20–21.) Instead, he began to walk away again. (Dkts. 47-2 ¶ 21; 54 ¶ 21.)

While holding the taser in his right hand, Officer Benton grabbed Plaintiff's arm with his free hand. (Dkts. 47-2 ¶ 22; 54 ¶ 22; 55-1 ¶ 16.) He advised Plaintiff again that he was being stopped for walking in the center turn lane in the middle of the road. (Dkts. 47-2 ¶ 23; 54 ¶ 23; 55-1 ¶ 17.) Plaintiff then told Officer Benton to "get away from [him]" and that he was not doing anything. (Dkts. 47-2 ¶ 24; 54 ¶ 24.)

Officer Benton repeatedly — more than a dozen times, from the Court's review of the body-cam footage — ordered Plaintiff to stop and sit down on the sidewalk. (Dkt. 55-1 ¶¶ 14–15.) He also expressly and clearly warned Plaintiff, "I'm going to tase you if you don't sit down." (Dkts. 47-2 ¶¶ 25–26; 54 ¶¶ 25–26; 55-1 ¶ 18.) Plaintiff ignored the repeated warnings and took several steps onto Memorial Drive to get around and away from Officer Benton when Officer Benton announced "Taser, Taser, Taser." (Dkts. 47-2 ¶ 29; 54 ¶ 29; 55-1 ¶ 20.) Officer Benton deployed his taser, the prongs of which struck Plaintiff in his left

arm.   (Dkts. 47-2 ¶ 29; 54 ¶ 29; 55-1 ¶ 20.)   The entire interaction occurred over the span of less than one minute.  (Dkts. 47-2 ¶ 30; 54 ¶ 30.)

After tasing Plaintiff, Officer Benton placed him in handcuffs and removed the taser prongs from Plaintiff's arm, which left a blood stain on Plaintiff's sweater.   (Dkts. 47-2 ¶ 31;  54 ¶ 31;  55-1 ¶ 26.)   He then arrested Plaintiff for violating O.C.G.A. § 40-6-92 (crossing at other than a  crosswalk)  and  O.C.G.A.  § 16-10-24  (obstruction  or  hindering  law enforcement officers).  (Dkts. 47-2 ¶ 31; 54 ¶ 31; 55-1 ¶ 27.) After placing Plaintiff into custody, Officer Benton's interactions with Plaintiff ceased. (Dkts. 47-2 ¶ 32; 54 ¶ 32.)

Defendant Officer Fox arrived on the scene as a result of Officer Benton radioing his location.  (Dkts. 47-2 ¶ 33; 54 ¶ 33.)  Officer Fox arrived after Officer Benton had deployed his taser and did not witness the incident, only the aftermath. (Dkts. 47-2 ¶ 33; 54 ¶ 33.) When he got there, Officer Fox assumed responsibility for directing traffic and taking witness statements.  (Dkts. 47-2 ¶ 34; 54 ¶ 34.)  An ambulance arrived, and paramedics began to treat Plaintiff.  (Dkts. 47-2 ¶ 35; 54 ¶ 35.)  The paramedics obtained Plaintiff's vitals and found him to be "tachycardic and hypertensive." (Dkt. 55-1 ¶ 29.)  Plaintiff claims to have overheard

the paramedics and Defendant Fox talking.  (*Id.* ¶ 34.)   He claims Defendant Fox said "Yeah, I'll take him [to the hospital]."  (*Id.* ¶ 37.) Once the paramedics completed their assessment of Plaintiff, Officer Fox transported him to the DeKalb County Jail, not a hospital.  (Dkts. 47-2 ¶ 36; 54 ¶ 36.)

Officer Fox testified that, from what he observed at the scene, Plaintiff had suffered only a minor injury related to being tased.  (Dkts. 47-2 ¶ 37; 54 ¶ 37.)  The prongs of the taser had both hit Plaintiff in his left arm.  He had no injuries to his face or head that would suggest he had fallen and injured himself during or after the tasing.  (Dkts. 47-2 ¶ 38; 54 ¶ 38.)  Plaintiff did, however, have a small spot of blood on his sweater from where the barbs had hit him.  (Dkt. 54 ¶ 38.)

Officer Fox also testified that he never observed Plaintiff display any difficulty walking, talking, or breathing normally.  (Dkt. 47-2 ¶ 39.) He also claims to not recall Plaintiff complaining that he felt unwell, though Plaintiff claims he complained.  (Dkts. 47-2 ¶ 40; 54 ¶ 40.)

Although Officer Fox did not observe any symptoms that made him believe Plaintiff had suffered a serious injury, he knew that the DeKalb County Jail had medical staff and a medical unit.  (Dkts. 47-2 ¶ 41; 54

¶ 41.)  He also knew the jail would not accept arrestees with medical needs beyond its capabilities.  (Dkts. 47-2 ¶ 41; 54 ¶ 41.)

Once Officer Fox brought Plaintiff to the jail, he notified the intake staff that Plaintiff had been in an altercation involving the use of a taser, which prompted the detention officer to call a nurse.  (Dkts. 47-2 ¶ 42; 54 ¶ 42.)  Staff at the jail did not refuse to accept Plaintiff because of any medical condition but rather admitted him to its medical facility.  (Dkt. 55-1 ¶ 39.)  Officer Fox's interactions with Plaintiff concluded at that time.  (Dkts. 47-2 ¶ 43; 54 ¶ 43.)

While at the jail, the medical staff treated Plaintiff for high blood pressure and administered medication.  (Dkt. 55-1 ¶¶ 39–42.)  He remained in the medical unit until the jail released him later that same day.  (Dkts. 47-2 ¶ 44; 54 ¶ 44; 55-1 ¶ 45.)  Plaintiff's mother, a registered nurse, picked up Plaintiff from jail.  (Dkts. 47-2 ¶ 45; 54 ¶ 45.)  He did not seek any further medical treatment until two days after his release. (Dkts. 47-2 ¶ 46; 54 ¶ 46; 55-1 ¶ 46.)  The County subsequently dropped all criminal charges against Plaintiff.  (Dkt. 55-1 ¶ 55.)

In responding to Defendants' motion for summary judgment, Plaintiff presents his own statement of material facts that he claims are

disputed and preclude summary judgment.  (Dkt. 55-1.)  A large portion of Plaintiff's facts, however, concern his medical issues while at the jail and following his release from jail.  (*Id.* ¶¶ 40–53.)  All of those facts occurred after Officer Benton's and Officer Fox's interactions with him. The Court thus finds many of Plaintiff's facts immaterial to the Court's summary judgment determinations, which concern only the facts and circumstances known to Defendants at the time of the incident, not what medical issues may have later arisen, unknown to Defendants.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (recognizing that the situation "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

Plaintiff originally filed this suit against Officers Benton and Fox and DeKalb County, alleging both federal and state claims related to his arrest.  (Dkt. 1.)  The Court granted Defendants judgment on the pleadings for most of Plaintiff's claims, dismissing all of Plaintiff's state-law claims and dismissing DeKalb County as a party defendant.  (Dkt. 20 at 28.)  All that remains of Plaintiff's claims are the following:  (1) an individual capacity § 1983 excessive-force claim against Officer Benton; (2) an individual capacity § 1983 deliberate indifference medical-care

claim against Defendant Fox; and (3) a claim for punitive damages based on the success of either of the first two claims.  (*Id.*)  Defendants move for summary judgment on all counts.  (Dkt. 47.)

## II.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact that a jury should decide at trial.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A moving

party meets this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The movant, however, need not negate the other party's claim. *Id.* at 323. In determining whether the moving party has met this burden, a court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The

court, however, resolves all reasonable doubts in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

Additionally, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 372 (2007).

## III.   Analysis & Discussion

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted). So "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*,

563 U.S. 731, 743 (2011).   It allows officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  When properly applied, qualified immunity thus "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010).  The parties agree Defendants acted within the scope of their discretionary authority.  (Dkt. 47-1 at 12.)  Plaintiff thus has the burden of showing that qualified immunity is unavailable to Defendants.  *See Lee*, 284 F.3d at 1194.

The qualified immunity analysis presents two questions:  first, whether the allegations, taken as true, establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established when the violation occurred. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).  These distinct questions "do not have to be analyzed sequentially." *Fils v. City of Aventura*, 647 F.3d 1272,

1287 (11th Cir. 2011).  Instead, a court may address them in either order, although a plaintiff's failure on either prong dooms his claim.  *Id.*

On summary judgment, the burden thus lies with Plaintiff to show that Defendants' actions violated the relevant constitutional rights and that the rights were clearly established at the time of the arrest.  *See Hadley*, 526 F.3d at 1329.

## A.    Excessive Force Claim Against Officer Benton

Plaintiff alleges excessive force under § 1983, arguing that Officer Benton violated his Fourth Amendment rights by using a taser in arresting him for what was essentially jaywalking.  (Dkt. 1 ¶¶ 48–51.) Officer Benton claims he is entitled to qualified immunity because the use of force was objectively reasonable.  (Dkt. 47-1 at 17.)  The Court agrees.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee*, 284 F.3d at 1197.  The Fourth Amendment's "objective reasonableness" standard governs whether a constitutional violation occurred.  *See Hadley*, 526 F.3d at 1329.  At the same time, "the right [of police] to make an arrest

necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Lee*, 284 F.3d at 1200 (quoting *Graham*, 490 U.S. at 396).

In balancing an officer's need to use force in making an arrest or conducting an investigatory stop versus an individual's Fourth Amendment rights, a court will consider multiple factors.  These include the severity of the crime being investigated, whether the suspect poses an immediate threat to the officer's safety, and whether the suspect is resisting or evading the officer's attempt to make an arrest.  *Id.* at 1197– 98.  Courts may also consider "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted, and (4) whether the force was applied in good faith or maliciously and sadistically."  *See Hadley*, 526 F.3d at 1329 (quoting *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)).  In considering the totality of the circumstances, the force used must be reasonably proportionate and objectively reasonable.  *Lee*, 284 F.3d at 1198.

A court, however, must assess "the reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene,

14

rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397; *see also Hadley*, 526 F.3d at 1330 ("[E]xcessive force is judged solely on an objective basis."). Using the "reasonableness at the moment" standard to evaluate an excessive force claim, it follows that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

In several cases, the Eleventh Circuit has held that the single deployment of a taser on a noncompliant, resisting suspect does not constitute excessive force. *See, e.g.*, *Barfield v. Rambosk*, 641 F. App'x 845, 846 (11th Cir. 2015) (holding use of taser to control and handcuff noncompliant plaintiff did not amount to excessive force); *Draper v. Reynolds*, 369 F.3d 1270, 1272 (11th Cir. 2004) (holding use of taser reasonable where plaintiff was "hostile, belligerent, and uncooperative" and refused to retrieve documents requested by the officer in a traffic stop). In both instances, the law enforcement officers initiated the stops for minor offenses: a suspicious vehicle investigation in *Barfield* and an improperly illuminated tag light in *Draper*. Such is the case here, where

Officer Benton first stopped Plaintiff for walking down the middle of the street and then ultimately cited him only for jaywalking.

But in both *Draper* and *Barfield*, the suspects also both refused to obey multiple commands from police.  The facts are undisputed here that Plaintiff likewise refused to obey repeated commands issued by Officer Benton after a lawful stop.  Plaintiff admits — and the body-cam video evidence clearly shows — he ignored Officer Benton's commands, though he seeks to mitigate this by characterizing his resistance as "passive." (Dkt. 55 at 5.)  The record, however, betrays Plaintiff's claims of "passive resistance."   Plaintiff repeatedly ignored Officer Benton's commands, became demonstrably irritated, and even wrested his arm away from Officer Benton's grasp.  Plaintiff presents no binding authority that "passive resistance" is an acceptable form of non-compliance that precludes the reasonableness of the use of a taser.  So whether Plaintiff characterizes his resistance as "active" or as "passive," the record undisputedly shows that he resisted Officer Benton's efforts to detain him.  *See Glasscox*, 903 F.3d at 1214.  And given Plaintiff's increasing agitation during the stop, the "single use of the taser gun may well have prevented a physical struggle and serious harm to either [Plaintiff] or

[Officer Benton]." *Draper*, 369 F.3d at 1278.  This factor weighs heavily in favor of finding the use of force reasonable under the circumstances.

The need for the use of force was also reasonably proportional to the amount of force used.  After Plaintiff ignored his repeated commands, Officer Benton deployed his taser once.  *See id.* ("Although being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used—a single user of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury.").  He did not continue to shock Plaintiff or tase him again, as the need for that force would have been objectively unreasonable once Plaintiff stopped resisting.  *Glasscox*, 903 F.3d at 1214 ("Even if the arrestee's resistance justified deployment of the taser initially, if he has 'stopped resisting . . . during this time period,' further taser deployments are excessive." (quoting *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016))).

The extent of the injury inflicted also weighs in Officer Benton's favor.  The prongs of the taser stuck into Plaintiff's left arm, leaving a blood stain once Officer Benton removed them.  And though Plaintiff was visibly distressed as he sobbed on the sidewalk, he was not seriously

wounded and did not suffer any long-term physical injury as a result.[2] *See Draper*, 369 F.3d at 1278 (finding no serious injury inflicted by single taser shock). The Court finds the extent of any injuries weighs in favor of a finding that the force was objectively reasonable.

The record also contains no evidence that Officer Benton applied the force maliciously or sadistically. *See Hadley*, 526 F.3d at 1329. And Plaintiff presents nothing to challenge the evidence that Officer Benton acted in good faith in effectuating his arrest. After considering the totality of the circumstances, the Court holds that, under the "reasonableness at the moment" standard, Officer Benton's use of force was objectively reasonable for an officer in his position.

In his response brief in opposition to summary judgment, Plaintiff focuses on the policies of DeKalb County and claims that Officer Benton's actions violated that policy. (Dkt. 55 at 8.) And they may well have been. But whether an individual law enforcement officer's actions violated a

---

[2] In his deposition testimony, Plaintiff testified that he sought treatment for schizophrenia about a year after the incident and now contends his schizophrenia resulted from being tased. (Dkt. 48 at 46:5–7.) He provides no other evidence to support this causal connection, however. And the Court need not draw inferences that are otherwise unsupported by the record.

municipal policy does not decide whether the officer violated someone's *constitutional* rights, the determination the Court makes here. *See, e.g.*, *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1527 (11th Cir. 1987) (holding violation of state statute "does not define" or constitute a federal constitutional violation).

Plaintiff's argument also comes with the benefit of hindsight, which the Court must do its best to disregard. *See Piazza v. Jefferson Cty.*, 923 F.3d 947, 953 (11th Cir. 2019) ("[W]e can't (and won't) evaluate a pretrial detainee's excessive-force challenge in a glib, post-hoc fashion or 'with the 20/20 vision of hindsight.'  Instead, we must do our best to consider the situation through the lens of a 'reasonable officer on the scene.'") (quoting *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). For instance, Plaintiff argues about what he believes Officer Benton could have or should have done rather than deploy the taser.  (Dkt. 55 at 9 ("Officer Benton twice held Mr. Kinlocke's arm/hard [sic] and could have forced his compliance by pulling the arm behind the back.").)  Of course, in looking at the events with the benefit of hindsight, Officer Benton *could* have taken many different actions other than tasing Plaintiff.  But as stated above, the Court bases its analysis on the record evidence of the

circumstances Officer Benton confronted not from the perspective of its peaceful chambers. *See Piazza*, 923 F.3d at 953. The Court does not second-guess the judgment of law enforcement officers with "could haves" and "should haves" laid out during litigation but rather considers them in the context and in the field. *See Williams v. Deal*, 659 F. App'x 580, 596 (11th Cir. 2016) (recognizing that courts "usually don't second-guess the decisions made by police officers in the field" (internal quotation marks omitted)).

With help from the body-cam footage, the record presents no genuine issue of material fact about the interaction between Plaintiff and Officer Benton. The totality of the circumstances supports the reasonableness of Officer Benton's use of force, from the perspective of a reasonable officer at the scene. The Court finds no constitutional violation and thus concludes that Officer Benton is entitled to qualified immunity.[3] The Court grants Defendants' motion for summary judgment and dismisses Plaintiff's § 1983 claim for excessive force.

---

[3] Because the Court has determined that Defendant Benton did not violate Plaintiff's constitutional rights, the Court need not decide whether the law was clearly established at the time of the incident. *See Wood v. Kesler*, 323 F.3d at 878 ("If no constitutional right would have

**B.     Deliberate Indifference Claim Against Officer Fox**

Plaintiff asserts a § 1983 deliberate indifference claim against Defendant Officer Fox, alleging he violated Plaintiff's constitutional rights by transporting him to the DeKalb County Jail rather than to Grady Hospital.  (Dkt. 1 ¶¶ 36–37.)   Officer Fox moves for summary judgment, arguing he is entitled to qualified immunity.  (Dkt. 47-1 at 18.) The Court agrees.

Under the Due Process Clause of the Fourteenth Amendment, government officials must provide medical care to individuals injured during apprehension by the police.  *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015).  To prevail on a § 1983 claim of deliberate indifference, a plaintiff must show three things:  "(1) a serious medical need;  (2) a defendant's deliberate indifference to that need;  and (3) causation between that indifference and the plaintiff's injury."  *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016).  The second factor — deliberate indifference — consists of three subcomponents:  (1) subjective

---

been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001))).

knowledge of a risk of serious harm; and (2) disregard of that risk; (3) by conduct that is more than gross negligence. *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015). To avoid summary judgment on a claim for deliberate indifference, a plaintiff must present evidence of each element.

Officer Fox concedes that Plaintiff's elevated heart rate and blood pressure presented an objectively serious medical need. (Dkt. 47-1 at 19.) The Court, however, finds no record evidence to support the remaining factors. Although Plaintiff now complains that Officer Fox should have brought him to the hospital and perhaps even said he would bring him, it is undisputed that Officer Fox brought Plaintiff to the DeKalb County Jail where he received adequate medical care for his injuries. (Dkts. 47-2 ¶¶ 36, 44; 54 ¶ 36, 44.) The record contains no evidence to suggest Officer Fox subjectively inferred that Plaintiff faced a substantial risk of harm, knowing delay would exacerbate a life-threatening or urgent medical condition, and then intentionally delayed providing access to medical treatment. *See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1318 (11th Cir. 2010). He took him somewhere, without delay, where he received medical treatment.

22

Officer Fox arrived on the scene shortly before the paramedics did. (Dkt. 47-2 ¶ 4.)  He testified that he observed Plaintiff had sustained a minor injury consistent with being tased.  (*Id.* ¶ 8.)  He did not observe Plaintiff having any difficulty walking, talking, or breathing normally. (*Id.* ¶ 8.)  He also testified that he knew DeKalb County Jail had a medical staff and that it would not accept arrestees with medical needs too serious for its capabilities.  (*Id.* ¶ 10.)  But the jail did not turn him away.

It is also undisputed both that Officer Fox told the staff at the jail that police had tased Plaintiff and that Plaintiff did in fact receive medical treatment and medical supervision at the jail, including medication for his elevated blood pressure.  (Dkt. 54 ¶¶ 42–44.)  The record contains no evidence from which a jury could conclude Officer Fox was aware of a serious risk of harm to Plaintiff or that he intentionally disregarded that risk.

Plaintiff counters that he overheard Officer Fox speaking with the paramedics on the scene, saying "I'll take him [to the hospital]."  (Dkt. 48 at 40:14–18.)  But even drawing all reasonable inferences in Plaintiff's favor as the Court must, bringing Plaintiff to the jail for medical care

does not constitute deliberate indifference to a medical need.  *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (explaining that there is no constitutional violation where an inmate receives adequate medical care but desires different modes of treatment).  And whether Officer Fox said he would take Plaintiff to the hospital is immaterial to the Court's summary judgment determination.  Plaintiff has pointed to no evidence tending to show that Officer Fox's potential decision to bring Plaintiff to the medical unit of the jail rather than to a hospital represented an intentional disregard of a substantial risk leading to greater harm to Plaintiff.

And Plaintiff has presented no evidence — and does not argue — that the medical care provided to him at the jail was inadequate.  (*See* Dkt. 57 at 5.)  He points to nothing in the record showing that a hospital would have done anything differently.  And even if he could point to this evidence, "the issue is not whether *better* medical care could have been provided, but whether the medical care that *was* provided was adequate." *Calhoun v. Volusia Cty.*, 499 F. Supp. 2d 1299, 1310 (M.D. Fla. 2007) (citing *Hamm*, 774 F.2d at 1575).  It is undisputed that Plaintiff received adequate medical care at the jail.  *See Pourmoghani-Esfahani*, 625 F.3d

24

at 1318 (finding no constitutional violation where plaintiff "pointed to no evidence in the record that Defendant possessed subjective knowledge of a medical need that required something more drastic than" the care offered at the jail).

Plaintiff argues in his brief that "[i]t is a reasonable inference that Plaintiff would have received medical treatment for his serious conditions more quickly at a hospital than at the jail." (Dkt. 55 at 13.) But Plaintiff has presented no evidence from which the Court could draw that inference. *See Wilson v. Miller*, 650 F. App'x 676, 680 n.4 (11th Cir. 2016) (noting that a non-movant does not have the benefit of "pure conjecture and speculation" in argument on summary judgment); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996) (holding that court may draw inferences in favor of the nonmoving party only when they are reasonable and "have a real basis in the record"). To succeed, an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay. *See Harris v. Coweta Cty.*, 21 F.3d 388, 393 (11th Cir. 1994). Plaintiff has not done so.

And given the geographic locations of the jail compared to the hospital relative to the scene, along with the fact that Plaintiff received treatment at the jail quickly, and that there appears to have never been a possibility that the paramedics intended to bring Plaintiff to the hospital themselves, Plaintiff's request is not even a reasonable inference. *See Wilson*, 650 F. App'x at 680 n.4 ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." (internal quotation marks omitted)).   The Court agrees with Defendants that "Plaintiff is remarkably asking this Court to take judicial notice of presumed wait times and treatment possibilities at Grady Hospital." (Dkt. 57 at 6.)  The Court declines to draw such conjectural conclusions.

Even assuming that Plaintiff could show that Officer Fox had the requisite subjective knowledge of facts about the extent of Plaintiff's injuries and that transporting him to the jail — where he received adequate medical treatment — disregarded a serious risk of harm, Plaintiff still cannot show that Officer Fox "displayed conduct beyond (or conduct even approaching) gross negligence." *See Pourmoghani-Esfahani*, 625 F.3d at 1318; *see also Mann v. Taser Int'l Inc.*, 588 F.3d

1291, 1307 (11th Cir. 2009). The Court finds that Plaintiff has failed to point to any evidence in the record to support a claim for deliberate indifference and holds that Officer Fox did not violate Plaintiff's constitutional rights.[4] Qualified immunity shields Officer Fox from Plaintiff's § 1983 claim for deliberate indifference. The Court thus grants Defendants' motion for summary judgment on this count.

Because the Court has granted summary judgment to Defendants on each of the remaining substantive claims, the Court likewise dismisses Plaintiff's claim for punitive damages. *See Mann*, 588 F.3d at 1304–05 ("[W]here a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required.").

## IV. Conclusion

The Court **GRANTS** Defendant Officers Casey T. Benton and J.E. Fox's Motion for Summary Judgment (Dkt. 47) and **DISMISSES** this action.

---

[4] Having determined that no constitutional violation resulted from Plaintiff being treated at the jail versus a hospital, the Court need not consider whether the law was clearly established at the time of the incident. *See Fils*, 647 F.3d at 1287.

**SO ORDERED** this 6th day of December, 2019.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE